16-1674, -1765, -1802

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

————————

ISOLA USA CORPORATION,

Plaintiff - Cross-Appellant,

v.

TAIWAN UNION TECHNOLOGY CORPORATION,

Defendant - Appellant.

————————

On Appeal From the United States District Court for the District of Arizona
Case No. 2:12-cv-01361
Hon. Sharon L. Gleason

————————

## NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF FOR CROSS-APPELLANT ISOLA USA CORPORATION

————————

Richard T. Mulloy
Erin P. Gibson
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
619.699.2700

Stuart E. Pollack
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
212.335.4964

*Attorneys for Plaintiff/Cross-Appellant
Isola USA Corporation*

# CERTIFICATE OF INTEREST

ISOLA USA CORPORATION. v. TAIWAN UNION TECHNOLOGY
CORPORATION
Nos. 16-1674, -1765, -1802

Counsel for Plaintiff-Cross-Appellant certifies the following:

1.    The full name of every party or amicus represented by me is:

      ISOLA USA CORPORATION

2.    The name of the real party in interest (if the party named in the caption is not
      the real party in interest) represented by me is:

      N/A

3.    All parent corporations and any publicly held companies that own 10 percent
      or more of the stock of the party or amicus curiae represented by me are:

      Isola Group.

4.    The names of all law firms and the partners or associates that appeared for
      the party or amicus now represented by me in the trial court or agency or are
      expected to appear in this court are:

      DLA Piper LLP (US), Richard T. Mulloy, Stanley J. Panikowski, Stuart E.
      Pollack, Erin P. Gibson, Jacob D. Anderson, Laura M. Kam, Aaron T.
      Goodman, Cynthia A. Ricketts (no longer with the firm), Allison L. Kierman
      (no longer with the firm), Clive McClintock (no longer with the firm); Snell
      & Wilmer L.L.P.:  Andrew F. Halaby, Jiarong Liu Lamiquiz (no longer with
      the firm), Lindsey E. Martinez

Dated:  October 21, 2016

                                        */s/ Richard T. Mulloy*
                                        Richard T. Mulloy

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF RELATED CASES..........................................................1

II.   INTRODUCTION. .....................................................................................1

III.  STATEMENT OF JURISDICTION. ..........................................................2

IV.   STATEMENT OF THE ISSUES. ...............................................................3

     A.    TUC's Appeal Issues..........................................................................3

     B.    Isola's Cross-Appeal Issues. ..............................................................4

V.    STATEMENT OF THE CASE. ...................................................................4

     A.    Isola Is A Leader In The Market For Products Used To Make
          Printed Circuit Boards.........................................................................4

     B.    Isola's Patents Claim A Formulation That Gives Resin
          Compositions Better Thermal Stability And Other Properties. ..........6

     C.    TUC Became An HSD Competitor By Copying Isola's
          Patented Technology. ..........................................................................9

     D.    TUC Became Aware Of Isola's '414 Patent In 2007 And Then
          Tried To Conceal Its Infringement....................................................11

     E.    Isola's Lawsuit And The Jury's Verdict. ...........................................15

     F.    The District Court's Post-Trial Rulings. ...........................................17

VI.   SUMMARY OF ARGUMENT...................................................................18

VII.  ARGUMENT..............................................................................................20

     A.    The Court Properly Found That TUC Was Subject To
          Jurisdiction In Arizona. .....................................................................20

          1.    Standard of Review.................................................................20

          2.    Legal Standard Regarding Personal Jurisdiction....................21

          3.    The District Court Properly Found That TUC Repeatedly
               Visited Arizona To Induce Customers To Use TUC's
               Infringing Products. ................................................................22

          4.    TUC Directed Conduct at Arizona, and Its Infringement
               Arises Out of or Relates to This Conduct...............................23

## TABLE OF CONTENTS
### (continued)

Page

5.  TUC's Deliberate Conduct in Arizona Makes Its Jurisdictional Arguments Meritless. ........................................26

B.  The Court Properly Construed "Resin Composition.".......................33

1.  The Ordinary Meaning of "Resin Composition" Is Not Limited to "Uncured Resin Composition.".............................34

2.  The Intrinsic Evidence Reinforces the Ordinary Meaning of "Resin Compositions." .........................................36

3.  The Claims of the Related '258 Patent Also Support the Plain and Ordinary Meaning of "Resin Composition."...........39

4.  TUC Tries To Inject A Non-Existent "Uncured" or "Varnish" Limitation. ..................................................39

C.  The District Court Properly Construed "Allyl Network Forming Compound." ...................................................................48

1.  The Isola Patents Describe the Importance of Avoiding Interpenetrating Polymeric Networks (IPNs). ........................48

2.  TUC's Criticism Of The District Court's Construction Lack Merit.......................................................................51

D.  The Law And Evidence Support The Jury's Verdict And The District Court's Rulings Regarding Validity. ....................................55

1.  The District Court Correctly Found That TUC Had Failed to Prove Indefiniteness.................................................55

2.  Substantial Evidence Supports the Jury's Verdict of No Invalidity Based On Nelco.....................................................60

E.  The Court Properly Found The Case Exceptional And Awarded Attorney's Fees...................................................................66

VIII.  THE DISTRICT COURT'S JMOL ON WILLFULNESS, DENIAL OF ENHANCED DAMAGES, AND REDUCTION IN ATTORNEY'S FEES SHOULD ALL BE VACATED POST-HALO. .......68

A.  The Supreme Court's Halo Decision Requires Vacating The District Court's JMOL Of No Willfulness........................................68

**TABLE OF CONTENTS**
**(continued)**

                                                                    **Page**

   B.    The Court's Denial Of Enhanced Damages And Reduction In
         Isola's Attorney's Fee Award Should Be Remanded For Further
         Consideration In Light Of Halo. .......................................................71
IX.   CONCLUSION............................................................................................73

Pursuant to Federal Circuit Rule 28(d)(l)(B), Plaintiff - Cross-Appellant Isola USA Corporation prepared a public version of its brief in which it redacted certain confidential information. Specifically, the material omitted on pages 10-14, 27, 30-32, 53-54, 58 and 60-65 contains references to information that was previously designated by Taiwan Union Technology Corporation or third parties as confidential pursuant to the protective order entered in the lower proceedings, sealed in the district court, and requires continued confidential treatment in this Court.  The material omitted primarily reflects the development and formulation of Taiwan Union Technology Corporation's products, communications between Taiwan Union Technology Corporation and its customers, and the development and formulation of alleged prior art.  None of the material omitted contains information designated confidential by Isola USA Corporation.

# TABLE OF AUTHORITIES

**Page**

## CASES

*3D Sys., Inc. v. Aarotech Labs., Inc.,*
   160 F.3d 1373 (Fed. Cir. 1998) ................................................................25

*Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.,*
   682 F. Supp. 2d 1237 (D. Colo. 2010)......................................................25

*Allied Colloids Inc. v. American Cyanamid Co.,*
   64 F.3d 1570 (Fed. Cir. 1995) ..................................................................65

*Anderson v. City of Bessemer City, N.C.,*
   470 U.S. 564 (1985)..................................................................................21

*Apple Inc. v. Samsung Elecs. Co.,*
   __F.3d__, 2016 WL 5864573 (Fed. Cir. Oct. 7, 2016) (*en banc*).....................70

*Aventis Pharm. Inc. v. Amino Chems. Ltd.,*
   715 F.3d 1363 (Fed. Cir. 2013) ................................................................34

*Aventis Pharma SA v. Hospira, Inc.,*
   743 F. Supp. 2d 305 (D. Del. 2010)..........................................................56

*Avocent Huntsville Corp. v. Aten Int'l Co.,*
   552 F.3d 1324 (Fed. Cir. 2008) ................................................................25

*Beverly Hills Fan Co. v. Royal Sovereign Corp.,*
   21 F.3d 1558 (Fed. Cir. 1994) ..................................................................31

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
   715 F.3d 891 (Fed. Cir. 2013), *vacated on other grounds by Nautilus,*
   *Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014) ....................................55

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
   783 F.3d 1374 (Fed. Cir. 2015) ................................................................55

*Daiichi Sankyo Co. v. Matrix Labs., Ltd.,*
   619 F.3d 1346 (Fed. Cir. 2010) ...........................................................21, 55

- iv -

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Dey, L.P. v. Sunovion Pharms., Inc.*,
    715 F.3d 1351 (Fed. Cir. 2013) .................................................62, 63

*Energetiq Tech., Inc. v. ASML Netherlands B.V.*,
    113 F. Supp. 3d 461 (D. Mass. 2015)................................24, 25, 29

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
    64 F.3d 1553 (Fed. Cir. 1995) ......................................35, 41, 47

*Exxon Research and Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001) ..........................................56

*Grober v. Mako Prods., Inc.*,
    686 F.3d 1335 (Fed. Cir. 2012) ......................................20, 21, 27, 28

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    831 F.3d 1369 (Fed. Cir. 2016) ..........................................70

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    136 S. Ct. 1923 (2016) ("*Halo*") ..........................................passim

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    134 S. Ct. 1744 (2014)..................................................66

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ..........................................68

*In re Gabapentin Patent Litig.*,
    503 F.3d 1254 (Fed. Cir. 2007) ..........................................53

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) ......................................2, 68, 69, 71

*In re Taiwan Union Tech. Corp.*,
    No. 2014-144, 587 F. App'x 638 (Fed. Cir. Sept. 19, 2014)..............................1

*In re Taiwan Union Tech. Corp.*,
    No. 2016-100 (Fed. Cir. Nov. 17, 2015) ..........................................1

- v -

## TABLE OF AUTHORITIES
### (continued)

Page

*Inamed Corp. v. Kuzmak*,
  249 F.3d 1356 (Fed. Cir. 2001) ............................................21, 23, 25

*Innovention Toys, LLC v. MGA Entm't, Inc.*,
  No. 2014-1731, 2016 WL 4151240 (Fed. Cir. Aug. 5, 2016) ....................71, 72

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)...................................................................21

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  424 F.3d 1374 (Fed. Cir. 2005) ...............................................60, 61

*Matsushita Elec. Indus. Co. v. United States*,
  750 F.2d 927 (Fed. Cir. 1984) ........................................................60

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008) .......................................................57

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011)......................................................................60

*Minn. Mining & Mfg. Co. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) .......................................................60

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)..................................................................55

*Novosteel SA v. United States*,
  284 F.3d 1261 (Fed. Cir. 2002) .......................................................52

*Octane Fitness LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014)......................................................20, 66, 68, 69

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)....................................34, 39

*PIN/NIP, Inc. v. Platte Chemical Co.*,
  304 F.3d 1235 (Fed. Cir. 2002) .......................................................35

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Plantronics, Inc. v. Aliph, Inc.*,
  724 F.3d 1343 (Fed. Cir. 2013) ........................................................42

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*,
  148 F.3d 1355 (Fed. Cir. 1998) ........................................................26

*Salazar v. Procter & Gamble Co.*,
  414 F.3d 1342 (Fed. Cir. 2005) ........................................................43

*Stryker Corp. v. Zimmer, Inc.*,
  No. 2013-1668, __ F.3d __, 2016 WL 4729504 (Fed. Cir. Sept. 12, 2016) ......71

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*,
  563 F.3d 1285 (Fed. Cir. 2009) ........................................................26

*W.L. Gore & Assocs. v. Garlock, Inc.*,
  721 F.2d 1540 (Fed. Cir. 1983) ...................................................62, 63

*Wayne Pigment Corp. v. Halox*,
  220 F. Supp. 2d 931 (E.D. Wis. 2002) ...............................................24

*WBIP, LLC v. Kohler Co.*,
  829 F.3d 1317 (Fed. Cir. 2016) ........................................................69

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  __F.3d__, 2016 WL 5112047 (Fed. Cir. Sept. 21, 2016)................................70

*Woodland Trust v. Flowertree Nursery, Inc.*,
  148 F.3d 1368 (Fed. Cir. 1998) ........................................................61

**STATUTES**

28 U.S.C. § 1295(a)(1)......................................................................3

28 U.S.C. § 1331.............................................................................3

28 U.S.C. § 1338(a) .........................................................................3

35 U.S.C. § 102(b) .............................................................3, 61, 62, 64

# TABLE OF AUTHORITIES
## (continued)

**Page**

35 U.S.C. § 112 ................................................................................55

35 U.S.C. § 271(b) ...........................................................................29

35 U.S.C. § 271(b) ...........................................................................24

35 U.S.C. § 284 ................................................................................69

35 U.S.C. § 285 ................................................................................66

MPEP § 1893.03(d)...........................................................................45

## OTHER AUTHORITIES

37 C.F.R. § 1.475(a) .........................................................................45

Fed. R. App. P. 28(c) ........................................................................52

Fed. R. Civ. P. 13.1 ..........................................................................45

## I.    STATEMENT OF RELATED CASES.

The only appeals in or from this case that were previously before this Court or any other appellate court were interlocutory petitions relating to discovery issues: *In re Taiwan Union Tech. Corp.*, No. 2014-144, 587 F. App'x 638, 639 (Fed. Cir. Sept. 19, 2014) (Judges O'Malley (author), Wallach, and Hughes) and *In re Taiwan Union Tech. Corp.*, No. 2016-100 (Fed. Cir. Nov. 17, 2015) (Judges Lourie, Dyk (author), and Hughes).  Counsel for Isola USA Corporation ("Isola") are not aware of any case in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## II.    INTRODUCTION.

A jury held Plaintiff-Appellant Taiwan Union Technology Corporation ("TUC") accountable for infringing Isola's patents, and the district court correctly declined TUC's invitation to jettison the jury's verdict.  TUC now seeks a free pass and a retrial from this Court, but its arguments lack merit.

TUC's personal jurisdiction arguments cannot overcome the district court's well-supported factual findings, including its findings that TUC repeatedly directed its activities toward Arizona and that TUC's witnesses repeatedly exhibited "a pronounced lack of candor under oath."  TUC's claim construction arguments cannot overcome the intrinsic record supporting the district court's rulings.  And TUC's invalidity arguments are inconsistent with the law and the substantial

evidence supporting the jury's verdict.  Finally, TUC has shown no abuse of discretion in the district court's decision that TUC's conduct—both before and during the litigation—renders the case exceptional.

The only rulings that warrant modification on appeal are the district court's post-trial JMOL of no willfulness, denial of enhanced damages, and reduction in the amount of attorney's fees awarded to Isola.  The first two rulings rested wholly, and the third rested at least partly, on *Seagate*'s objective prong.  Now that *Halo* has abolished *Seagate*'s objective prong, those rulings should be vacated and revisited after affirming the remainder of the judgment and the injunction against TUC.

## III.    STATEMENT OF JURISDICTION.

On March 15, 2016, the district court granted-in-part and denied-in-part TUC's motion for judgment as a matter of law or, in the alternative, a new trial.  Appx69.  Specifically, the district court granted TUC's motion for judgment as a matter of law on willfulness based on the objective prong of *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  Appx46-48.  The district court otherwise denied TUC's motion for judgment as a matter of law or, in the alternative, a new trial.  Appx60.  On the same day, the district court granted-in-part Isola's motion for attorney's fees (Appx62), but denied Isola's motion for enhanced damages (Appx48).

On April 5, 2016, Isola filed a cross-appeal with respect to the district court's grant of JMOL on willfulness, its denial of Isola's motion for enhanced damages, and its limitation of Isola's recovery of attorney's fees.

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction over Isola's cross-appeal under 28 U.S.C. § 1295(a)(1).

## IV.    STATEMENT OF THE ISSUES.

### A.    TUC's Appeal Issues.

1.    Applying the clear error standard of review to the district court's factual findings and credibility determinations, did the court properly exercise specific personal jurisdiction over TUC based on its purposeful contacts with Arizona on matters to which the litigation relates?

2.    Did the district court correctly reject TUC's attempt to narrow the term "resin composition" to include only uncured resin compositions, where neither the claim language nor the rest of the intrinsic evidence supports TUC's deviation from the term's plain meaning?

3.    In light of the intrinsic evidence, did the district court correctly construe "allyl network forming compound" and reject TUC's indefiniteness protest regarding U.S. Patent No. 6,509,414?

4.    Does substantial evidence support the jury's finding that claim 9 of U.S. Patent No. 8,022,140 is not invalid under 35 U.S.C. § 102(b)?

5.     Did the district court act within its discretion by finding the case exceptional and awarding attorney's fees based on TUC's conduct before and during litigation?

**B.     Isola's Cross-Appeal Issues.**

1.     Does the Supreme Court's decision in *Halo* require vacating the district court's decisions to grant JMOL of no willfulness and deny enhanced damages based solely on the objective prong of *Seagate*?

2.     Does the Supreme Court's decision in *Halo* require vacating the district court's decision to reduce Isola's fee award by half based at least partly on the now-obsolete JMOL of no willfulness?

**V.     STATEMENT OF THE CASE.**

**A.     Isola Is A Leader In The Market For Products Used To Make Printed Circuit Boards.**

This patent case is about the plastics used to make printed circuit boards ("PCBs").  In particular, the case concerns the usually green material, found in nearly every piece of electronics today, on which the electronics are mounted.

Isola is a manufacturer of products used to make PCBs.  Appx39573.  PCBs are essential to build electronic circuits from the integrated circuit packages that are used to make all modern solid-state electronics.  By mounting and interconnecting these electronic packages, PCBs allow different electronics systems and circuits to interconnect and talk to one another.  Appx39578-39579.

- 4 -

PCBs are composed of layers of copper-clad laminate boards ("laminates"), into which electronic components are soldered, and into which connections are etched in the copper foil layers.  Appx39578-39580.

Two types of products are at issue in this case: prepregs and laminates. Appx242-246.  Isola, and its competitor TUC, sell both prepregs and laminates, which are in turn used by fabricators to construct PCBs.  Appx39573, Appx40440, Appx41095.  Prepregs consist of a partially cured resin impregnated into, and reinforced by, a specially manufactured fiberglass cloth product or another reinforcing fiber.  Appx39842, Appx39948.  Laminates consist of one or more layers of prepreg pressed together with copper foil laminated on the top and bottom.  Appx39577-39578.  Both prepregs and laminates are resin compositions that have been cured (or reacted) to some degree through the use of heat. Appx39694-39695.

Isola is the industry leader in the high-speed digital ("HSD") market for prepregs and laminates, which are used in high-performance computing applications, such as servers, routers, switches and base stations.  *See* Appx39581-39582, Appx39697, Appx40595-40597.  Three of Isola's most important and commercially successful products in the HSD market are its FR408, IS415 and FR408HR products (collectively, "Isola's HSD products").  *See* Appx39581-39582.  Isola markets its HSD products to Original Equipment Manufacturers (or

"OEMs") such as Cisco, Google, and HP, who determine whether Isola prepregs and laminates will be used in their servers, routers, and other HSD products purchased by customers in the U.S. and abroad. Appx40189-40191. Isola then sells its products to PCB fabricators in the U.S. and overseas, who manufacture the PCBs used in those products. Appx40440.

### B. Isola's Patents Claim A Formulation That Gives Resin Compositions Better Thermal Stability And Other Properties.

On January 21, 2003, the United States Patent and Trademark Office ("USPTO") issued U.S. Patent No. 6,509,414 ("the '414 patent") entitled "Epoxy Resin, Styrene-Maleic Anhydride Copolymer and Co-Crosslinking Agent" to inventors Franz Tikart, Karl Heinz-Leis and Karl Walter Kopp. Appx210-216. On September 20, 2011, the USPTO issued U.S. Patent No. 8,022,140 ("the '140 patent") (together, with the '414 patent, the "Isola Patents") entitled "Epoxy Resin, Styrene-Maleic Anhydride Copolymer and Crosslinking Agent" to the same named inventors. Appx217-222. The Isola Patents have a priority date of October 29, 1996. Appx38272, Appx211, Appx218. Isola is the assignee and owner of all right, title and interest in and to the Isola Patents. Appx39703, Appx42281-42295, Appx42298-42300, Appx42303-42305, Appx42308-42309.

The Isola Patents are directed to resin compositions (such as prepregs and laminates) used in forming PCBs. Appx39845. These resin compositions are polymers, sometimes just called "plastics." The polymers claimed in the Isola

Patents generally include: (1) a polymer known as "copolymer of styrene and maleic anhydride" (or "SMA"); (2) another polymer known as "epoxy resin" used for flame retardant properties (known as an "FR4 epoxy resin"); and (3) a co-cross-linking agent chosen from compounds called bisphenol A (or "BPA"), bisphenol A diglycidyl ether (or "BPADGE"), or mixtures of these two.  Appx41757.  Claim 1 of the '414 patent and claim 9 of the '140 patent illustrate the combination of these components:

> 1.  A resin composition comprising
>
> an FR4 epoxy resin,
>
> a copolymer of styrene and maleic anhydride (SMA) as a first cross-linking agent,
>
> and a second cross-linking agent selected from the group consisting of brominated bisphenol A (BPA), brominated bisphenol A diglycidyl ether (BPADGE), and a mixture thereof,
>
> wherein the composition is free from an allyl network forming compound.

Appx215 at 7:37-43.

> 9. A resin composition comprising: a mixture of:
>
> an FR-4 epoxy resin;
>
> a crosslinking agent comprising a copolymer of styrene and maleic anhydride SMA), and;
>
> at least 5% by weight of a co-crosslinking agent selected from the group consisting of a brominated bisphenol A (BPA), brominated bisphenol A diglycidyl ether (BPADGE), and mixtures thereof.

Appx222 at 8:27-35.

The resin compositions described and claimed in the Isola Patents have several advantages over the prior art, including improved thermal stability and enhanced electrical properties, while avoiding the problem of brittleness that occurred in the prior art when SMA was used.  Appx212 at 2:48-51, Appx39846-39849.  Prior art resin compositions used in prepregs and laminates had problems withstanding high temperatures.  Appx212 at 1:10-26.  This is a problem because the materials are exposed to high temperatures during manufacturing.  Appx39846-39848.  The thermal stability of these products is often determined by the glass-transition temperature (or "$T_g$") of a resin composition, which is a temperature measure that indicates how well the prepreg or laminate will withstand high temperatures.  Appx39847.  Many researchers had tried to improve (*i.e.*, increase) resin composition $T_g$, but they had limited success.  Appx212 at 1:19-52.

In particular, some prior art inventors successfully improved epoxy resins by adding "allyl network forming compounds" to their resin compositions to form interpenetrating polymeric networks (or "IPNs").  Appx212-Appx213 at 1:28-37, 1:53-65, 2:66-3:2.  An IPN is a chemical network in which an allyl network is not bonded to the epoxy-styrene maleic anhydride network.  Instead, the two networks are interwoven as shown in the figure below:



Appx5156.  Forming IPNs could improve certain properties of a resin composition,

but it further complicated the prepreg and laminate manufacturing process, and had

other disadvantages.  Appx212 at 1:27-37, *id.* at 2:36-41, Appx214 at 5:39-42.  For

example, an additional "post-curing" process was required.  Appx213 at 3:18-19.

The inventors of the Isola Patents sought to design an epoxy resin

composition used in prepregs and laminates that still had high $T_g$ to provide better

thermal stability, yet avoided the drawbacks of using allyl network forming

compounds.  Appx212 at 2:41-62.  The inventors discovered that by adding a

cross-linking agent such as BPA or BPADGE—or a mixture of the two—they

could achieve "high thermal stability and a high $T_g$" without using allyl network

forming compounds that form IPNs, and hence without the problems associated

with such compounds.  Appx213 at 3:14-19.

## C.    TUC Became An HSD Competitor By Copying Isola's Patented Technology.

TUC is a direct competitor of Isola in the market for HSD prepregs and

laminates.  Appx39587.  TUC's competing HSD prepreg products are called TU-

Redacted Material Subject to Protective Order

87P SLK, TU-87P SLK Sp, TU-87P LK, TU-87P LK Sp, TU-87P SLK+, and TU-87P SLK Sp+. Appx39873-39874. TUC's competing HSD laminate products are called TU-872 LK, TU-872 SLK, TU-872 SLK Sp, TU-872SLK+, TU-872LK Sp, and TU- 872SLK Sp+. *Id.* (All these competing prepreg and laminate products are referred to collectively as "the TU-872 products.") TUC markets the TU-872 products to many of the same U.S.-based OEMs as Isola, and sells to many of the same PCB fabricators (both in the U.S. and overseas) as Isola. Appx40440-40443, Appx29306-29313, Appx30062. The TU-872 products have thus negatively impacted Isola's sales of HSD products. *See, e.g.*, Appx29886, Appx40448.

In 2006, TUC had no product in the rapidly expanding HSD market. Appx40259, Appx42344-42345, Appx42362. That year, TUC hired an Isola product engineer, Eric Liao. Appx40284. Mr. Liao had worked at Isola for eight years—including work on Isola's own HSD prepreg and laminate products— before moving to TUC. Appx40284-40287. As a result of his position, Mr. Liao had access to Isola's confidential product formulas, including the formulas for Isola's FR408 and IS415 products. Appx40284-40290.

During discovery in this case, it was revealed that TUC had a spreadsheet in its files with the heading "FR408," which is the name of Isola's patented HSD product that Mr. Liao knew about while he worked at Isola. Appx29899-29915, Appx40289-40290. Under this heading, █████████████████████

- 10 -

Redacted Material Subject to Protective Order



Appx40291, Appx29899-29915.  Although Mr. Liao offered

inconsistent theories at trial regarding why he had Isola's confidential information,

he ultimately acknowledged he had become aware of the FR408 formula while

working at Isola, and was one of the sources for the list of ingredients in the

spreadsheet.  Appx40289-40291.

TUC appointed Mr. Liao as

Appx40282-40283, Appx29917.  To accomplish this goal, Mr. Liao and TUC

Appx36947-36950, Appx29904-29905, Appx42342-42343.

### D. TUC Became Aware Of Isola's '414 Patent In 2007 And Then Tried To Conceal Its Infringement.

In 2007, Mr. Liao became aware of Isola's '414 patent while working for

TUC.  Appx40322.  By 2008, internal e-mail correspondence confirms that TUC

was concerned that its TU-872 products—then very close to being

commercialized—infringed the '414 patent.  Appx36927-36931, Appx29921-

Redacted Material Subject to Protective Order

29922, Appx29924, Appx29942.  At that time, TUC asked Mr. Liao to review the

'414 patent to determine if TUC's formulation infringed.  Appx36927.  Although

Mr. Liao had difficulty understanding the '414 patent, he gave his views on it to

TUC management anyway.  Appx36929.  After reviewing Mr. Liao's views on the

'414 patent, TUC employees recognized the need to seek expertise from

appropriate personnel regarding whether TUC infringed the '414 patent.

Appx36930-36931, Appx29921-29922.  Yet TUC failed to consult the necessary

personnel or obtain a legal opinion regarding infringement at any time.

Appx40261-40262, Appx29926-29932.

 Instead of seeking the expertise it needed regarding the '414 patent, TUC

chose another route.  Specifically, TUC added a "small amount" of a ██████

████████████████████████████████ to its TU-872 products, and then

implemented a strategy to try and conceal its infringement by convincing others

that it had added an "allyl network forming compound" excluded by the claims of

the '414 patent.  Appx29942, Appx40266-40267.  ████████████████████

███████████████████████████████████████████████

████████████████████  Appx39830, Appx27958-27959.  Moreover, TUC

discovered that adding even a small amount of ████████████████████████

███████████████████████████████████████████████

████████████████  Appx36934, Appx37199-37200.  For that reason, TUC

- 12 -

Redacted Material Subject to Protective Order

recognized that it needed to add ████████████████████████████

████████ Appx36936-36937, Appx37199-37200.  Consistent with TUC's

observations, the TU-872 products sold by TUC include ██████████████████

██████████████████████ Appx31445, Appx27069-27070.

TUC knew that the very small amount of ██████████ it added did not

change the properties of its products and ██████████████████ Appx36938-939,

Appx32900, Appx32902, Appx29964. ████████████████████████

████████████████████ Appx32869, Appx37199-37200.  The amount that

TUC added was so small that regulatory agencies like UL could not detect that

TUC had added the ████████████████ to its products, meaning TUC would

avoid having to start the UL testing over.  Appx36952-36953, Appx32900-32902.

████████████████████████████████████████████████

████████████████████████████ Appx32900-32902.  TUC's

internal documents acknowledge it took this "calculated risk" in continuing to

commercialize the infringing TU-872 products because of their "huge potential" to

become a $50 million per year business.  Appx30026, Appx30032-30035.

TUC also developed a "marketing strategy" based on ██████████████ to

conceal its infringement and "avoid being sued."  Appx40266-40267, Appx40344-

40345, Appx29942.  This marketing strategy consisted of adding language to its

product datasheets saying that the TU-872 products included "enhanced

Redacted Material Subject to Protective Order

toughness" as a result of an "allyl network forming compound" added to the

products. Appx36940-36942, Appx29936-29937, 29939-29940, 29944-29945,

29947-29948. However, TUC knew this statement to be false from its own studies

confirming that the miniscule amount of added ██████████ had no effect on the

products at all. Appx36941-36942, Appx29964. TUC also knew ████████

████████████████████████████████████████████████████████

██████  Appx36943, Appx37199-37200.

        In sum, the evidence presented at trial confirmed: (1) TUC acquired and

used Isola's patented formula, (2) TUC was aware of Isola's '414 patent before it

began selling the TU-872 products, (3) TUC was also aware that it faced a

substantial risk of infringing Isola's patent, (4) TUC acknowledged that it did not

have the expertise to properly evaluate infringement and needed to consult

appropriate personnel, (5) TUC never followed through on this; (6) TUC instead

chose to take a "calculated risk" and proceed with an infringing product, and

(7) TUC added a miniscule amount of the ██████████████████ to its TU-872

products and created marketing documents with false information not to avoid

infringement, but rather to try and conceal its infringement from Isola and avoid

being sued.

### E.    Isola's Lawsuit And The Jury's Verdict.

In June 2012, Isola filed suit against TUC alleging infringement of the '414 patent and a second patent, U.S. Patent No. 7,897,258 ("the '258 patent"). Appx229-238.  In August 2012, Isola amended its complaint to also allege infringement of the '140 patent.  Appx239-247.  TUC responded by filing a motion to dismiss for lack of personal jurisdiction or transfer the case.  Appx248.  After allowing jurisdictional discovery and additional briefing, the court denied TUC's motion in September 2013.  Appx2165.

The court held a tutorial and *Markman* hearing with live expert discussion over two days in August 2014.  Appx6025, Appx6106.  The district court issued its claim construction order in December 2014.  Appx162-207.  In August 2015, the district court granted TUC's motion for summary judgment of noninfringement of the '258 patent based on prosecution arguments that both sides acknowledged pertained only to that patent.  Appx 22322-22344.  That same day, the district court granted Isola's motion for partial summary judgment that the TU-872 products infringed claim 9 of the '140 patent.[1]  Appx22322.

---

[1] TUC's appeal brief suggests that the jury should not have been told about the district court's summary judgment ruling regarding the '140 patent, even though the jury was required to adjudicate the issue of damages regarding that patent. TUC Br. at 21.  TUC's suggestion is surprising because TUC *agreed* to joint jury instructions advising the jury regarding the grant of partial summary judgment Appx26244, Appx26246.  In any event, as with several other unwarranted swipes TUC takes at the district court's sound management of this case, TUC does not

On September 2, 2015—less than one week before trial was scheduled to begin—TUC filed a renewed motion to dismiss for lack of personal jurisdiction and requested expedited briefing.  Appx25230-25231.  Rather than force Isola to incur the prejudice of responding on the eve of trial on an expedited basis, the district court decided to address TUC's renewed motion after trial.  Appx26183-26186.

For two weeks in September 2015, the remaining issues in the case were tried to a jury.[2]  TUC filed a "supplement" to its motion to dismiss at the close of evidence, again seeking dismissal.  Appx28474-28486.  On September 18, 2015, the jury returned a verdict in Isola's favor.  Appx29174-29186.  The jury found that TUC infringed the Isola patents, that TUC's infringement of the '414 patent was willful, that TUC induced infringement of the Isola Patents, and that TUC had failed to prove that any of the asserted claims were invalid.  *Id.*  The jury awarded damages of $11,500,000 to Isola, with $8,500,000 in lost profits damages and $3,000,000 in reasonable royalty damages.  *Id.*  The district court entered judgment in Isola's favor on the issues tried to the jury.  Appx30612-30614.  The court then entered an amended judgment that included factual findings regarding TUC's unsuccessful indefiniteness defense.  Appx30615-30622.

---

actually make any legal argument based on this issue.

[2] TUC's defense of invalidity based on indefiniteness was tried to the district court judge outside the presence of the jury.

### F.    The District Court's Post-Trial Rulings.

Both parties filed post-trial motions after entry of judgment.  The district

court denied TUC's JMOL and new trial motions on all grounds except

willfulness.  Although the court found that evidence supported the jury's finding

that TUC intentionally infringed the '414 patent with no good faith belief that it

did not infringe, it nonetheless granted JMOL of no willfulness based solely on

*Seagate*'s objective prong.  Appx46-47.

The district court also denied TUC's renewed motions to dismiss based on

personal jurisdiction.  In doing so, the district court made extensive factual

findings based on the evidence.  Appx6-8.  The court found that TUC had

purposefully directed activities toward Arizona by, among other things, sending

TUC employees to Arizona multiple times to market the infringing TU-872

products to Arizona-based OEMs like Emerson, Intel and IBM.  *Id*.  The district

court further found that Isola's claims—specifically, the claim for inducement of

infringement—arose out of or were related to TUC's conduct in Arizona.  Appx12.

Finally, the district court made factual findings based on the evidence that TUC

and its witnesses did not provide credible testimony regarding the jurisdiction

issues.  Appx6-8.  The court observed that TUC's witnesses did not respond

credibly when questioned under oath and submitted at least one false declaration

stating that TUC conducted no commercial activity toward Arizona.  Appx8-9,

Appx13.  The court also found that TUC's failure to provide forthright testimony and responses likely prevented Isola from discovering additional evidence supporting jurisdiction.  *Id.*

The district court denied Isola's motion for enhanced damages because it had granted JMOL of no willfulness based solely on *Seagate*'s objective prong.  Appx48.  The court found the case exceptional based on TUC's egregious conduct and awarded attorney's fees to Isola, but reduced the fees award by 50% based at least partly on the JMOL of no willfulness.  Appx55, Appx59-62.  The court granted Isola's motion for a permanent injunction, but stayed the injunction pending TUC's compliance with certain bonding and escrow conditions.  Appx142-161.  Finally, the court granted Isola's motions for prejudgment interest, post-judgment interest, and costs.  Appx63-68.

## VI.    SUMMARY OF ARGUMENT.

TUC gives no good reason to disturb the verdict and judgment.

The district court's personal jurisdiction ruling was based on detailed factual findings, including TUC's witnesses' lack of candor regarding their contacts with Arizona and TUC's employees' many visits to Arizona to market infringing products to customers there.  TUC's purposeful conduct in traveling to Arizona to convince its OEM customers to use the infringing products easily supports

personal jurisdiction.  TUC cannot show clear error in the district court's factual findings, nor any error in the court's exercise of personal jurisdiction.

Likewise, neither of TUC's claim construction challenges has merit.

On the first claim construction issue, the ordinary meaning of "resin composition" includes both cured and uncured resin compositions.  Nothing in the specification or prosecution history justifies TUC's attempt to exclude cured resin compositions.  The intrinsic record instead confirms that the term's ordinary meaning includes cured and uncured compositions.

On the second claim construction issue, the district court construed "allyl network forming compound" consistent with the intrinsic record, which confirms that avoiding interpenetrating polymeric networks (IPNs) was a critical aspect of the '414 patent claims.  TUC's position disregards the "network forming" limitation in the claims, as well as repeated statements in the specification and prosecution history that the invention was designed to avoid the problems associated with IPNs.

Both of TUC's validity challenges also fail.  On the '414 patent, the district court correctly declined to find the term "allyl network forming compound" indefinite, especially the evidence demonstrated that persons of ordinary skill understood the scope of the claims.  On the '140 patent, substantial evidence supports the jury's verdict that it is not invalid based on TUC's failure to prove by

clear and convincing evidence that the alleged Nelco prior art was in public use under § 102(b).

On TUC's final appeal issue, the district court's exceptional case finding was well within its discretion.  TUC's conduct before the litigation (including its knowing theft of Isola's technology) and its conduct during the litigation (including its witnesses' lack of candor) make this case exceptional under *Octane Fitness*.

On Isola's cross-appeal, the Supreme Court's recent *Halo* decision requires vacating the district court's rulings on (1) willfulness, (2) enhanced damages, and (3) the amount of attorney's fees.  The jury found willfulness by clear and convincing evidence.  The district court's JMOL of no willfulness and denial of enhanced damages was based entirely on *Seagate*'s objective prong, and its reduction of Isola's fee award was based at least partly on the JMOL of no willfulness.  After the parties appealed, the Supreme Court abolished *Seagate*'s objective prong.  This Court's post-*Halo* decisions require vacating the district court's post-trial rulings that relied on its now-obsolete objective prong analysis.

## VII.  ARGUMENT.

### A.    The Court Properly Found That TUC Was Subject To Jurisdiction In Arizona.

#### 1.    Standard of Review.

The Court reviews a district court's determination of personal jurisdiction *de novo*.  *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012).

However, the Court must review any factual findings underlying the jurisdictional determination for clear error. *Id.* A factual finding is "clearly erroneous" only when the entire record leaves the reviewing court with a definite and firm conviction that a mistake was made. *Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010). The district court's factual findings must stand if they are plausible in light of the entire record, even if this Court would have weighed the evidence differently. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-574 (1985).

## 2. Legal Standard Regarding Personal Jurisdiction.

TUC disputes whether asserting jurisdiction in this case complies with due process. Due process requires that the defendant have sufficient "minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The due process requirement for specific jurisdiction is met where: (1) the defendant purposefully directed its activities toward the forum state, (2) the claim arises out of or relates to the defendant's contact with the forum state, and (3) the assertion of personal jurisdiction is reasonable and fair. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001). TUC contests only the first two requirements.

### 3. The District Court Properly Found That TUC Repeatedly Visited Arizona To Induce Customers To Use TUC's Infringing Products.

The district court found that the evidence demonstrated that "TUC personnel repeatedly came to meet with OEMs like Emerson and Intel in Arizona with the stated goal of inducing them to use TUC's infringing products." Appx12; *see also* Appx4-5. The district court found that several TUC executives and employees traveled to Arizona to convince large OEM customers such as Intel, IBM, and Emerson to use the infringing TU-872 products. Appx6-8. The district court also found that TUC employees also attended trade shows and engaged in written communications with Arizona OEMs to market the TU-872 products. Appx6-8, Appx12. Further, the district court found that "[t]he discovery that was eventually produced demonstrates that TUC's infringing products, more likely than not, have been present in Arizona." Appx13, citing Appx37120-37122, Appx42207, Appx42210, Appx42214, Appx42216.

In addition, the district court noted that its factual findings were necessarily limited to the e-mail record that TUC elected to produce because virtually every TUC employee who testified regarding their contacts with Arizona failed to tell the truth. Appx8. For example, the district court found that the TUC employee declaration submitted in support of its motion to dismiss that denied TUC conducted *any* business in Arizona was not credible. Appx9, Appx56. The district

- 22 -

court likewise found that the testimony by other TUC executives and employees denying TUC's business activities in Arizona was not credible, particularly in the face of several e-mails confirming they personally traveled to Arizona to market the TU-872 products: "[T]he Court finds that TUC has been considerably less than forthright in providing true and complete responses to discovery, which would have permitted Isola to meaningfully explore the full extent of TUC's contacts with Arizona." Appx13.

### 4.    TUC Directed Conduct at Arizona, and Its Infringement Arises Out of or Relates to This Conduct.

TUC cannot show that any of the district court's factual findings are clearly erroneous, or that the district court erred by ruling that TUC had sufficient minimum contacts to establish personal jurisdiction. Appx10-13. On the first prong of the jurisdictional test, the district court concluded that TUC purposefully directed activities toward Arizona because "TUC repeatedly visited Arizona in order to promote its infringing products to OEMs such as Emerson and Intel located in Arizona in the hopes of garnering more sales of the infringing 872 products. . . . TUC repeatedly visited OEMs in Arizona with the stated aim of persuading those OEMs to use TUC's infringing products." Appx12. The evidence supports the district court's factual findings, and the record shows that TUC purposefully directed activities toward Arizona. *See Inamed*, 249 F.3d at 1360; Appx12, Appx30261, Appx30374-375, Appx30377-30378, Appx30380-

30381, Appx30383, Appx30399, Appx25779-25805, Appx25809, Appx42194-42195, Appx42197, Appx42205.

On the second prong—whether Isola's claims "arise out of or relate to" TUC's activities in Arizona—the district court concluded that Isola's claims in the lawsuit, including its claims for inducing patent infringement under 35 U.S.C. § 271(b), arose of out of TUC's activities.  The district court noted that "TUC personnel repeatedly came to meet with OEMs like Emerson and Intel in Arizona with the stated goal of inducing them to use TUC's infringing products."  Appx12. Isola's claim for inducement of infringement under § 271(b) arises from TUC's efforts in Arizona to induce OEMs to use the TU-872 products.  *See* Appx42207, Appx42210, Appx42216, Appx42214, Appx42238, Appx42245-42246, Appx42248, Appx37117-118, Appx30304.  Several district courts have recognized that inducement of infringement in the forum state can form the basis for jurisdiction.  *See Energetiq Tech., Inc. v. ASML Netherlands B.V.*, 113 F. Supp. 3d 461, 467  (D. Mass. 2015) ("[A] claim under this subsection [§ 271(b)] certainly 'arises out of or relates' to inducing conduct.  Contrary to ASML BV's contention, this is not a novel proposition.  'Because a patent holder may suffer economic loss both in the place where infringement is induced or contributed to and the place where a third-party ultimately infringes the patent, courts have considered both to be the situs of the injury.'"); *see also Wayne Pigment Corp. v. Halox,* 220 F. Supp.

2d 931, 936-37 (E.D. Wis. 2002) (inducing activity created minimum contacts);

*Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.*, 682 F. Supp. 2d 1237, 1246-48 (D.

Colo. 2010) (personal jurisdiction based on induced infringement in forum state);

*see also Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1330, 1337

(Fed. Cir. 2008) (noting that this Court's interpretation of the "arise out of or relate

to test" is "far more permissive" than those of other circuits).

    Moreover, even if the Court were to find that Isola's claims do not "arise out

of" TUC's activities directed toward Arizona—and there is no legal basis for doing

so—Isola's claims are at least "related to" TUC's activities.  "Although the nexus

necessary to satisfy the 'arise out of or related to' requirement of the due process

inquiry has not been clearly delineated by the Supreme Court, we have stated that

it is significant that the constitutional catch-phrase is disjunctive in nature,

indicating an added flexibility and signaling a relaxation of the applicable standard

from a pure 'arise out of standard.'"  *Inamed*, 249 F.3d at 1362.  At a minimum,

TUC's marketing of the TU-872 products to Emerson, Intel and others in Arizona

"relates to" Isola's patent infringement and inducing infringement claims in this

case.  *3D Sys., Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1379 (Fed. Cir. 1998)

(defendant's claim related to activities in forum where actions "generat[ed] interest

in a potential infringing product to the commercial detriment of the rightful

patentee"); *Energetiq*, 113 F. Supp. 3d at 467 (inducement claim "certainly 'arises

out of or relates' to inducing conduct").  Indeed, TUC's marketing efforts toward Arizona OEMs are the type of actions that formed the basis for Isola's inducement claims (and the jury's inducement verdict) in this case.  Appx11-12, Appx41469-41471; *see also* Appx42207, Appx42210, Appx42216, Appx42214, Appx42238, Appx42245-42246, Appx42248, Appx37117-118, Appx30304.  Because Isola's claims in this case arise out of or relate to TUC's marketing of the TU-872 products in Arizona, TUC had sufficient minimum contacts and jurisdiction is proper.

### 5.    TUC's Deliberate Conduct in Arizona Makes Its Jurisdictional Arguments Meritless.

Each of TUC's arguments regarding why the district court was wrong on personal jurisdiction fail.  TUC's argument that its marketing activities in Arizona regarding the TU-872 products cannot establish jurisdiction because they reflect "isolated" or "sporadic" contact is contrary to the law because specific jurisdiction can exist based on "a single act" or other "isolated or sporadic" contacts.  *See, e.g.*, *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1297 (Fed. Cir. 2009) ("[A] court may properly assert specific jurisdiction, even if the contacts are isolated and sporadic, so long as the cause of action arises out of or relates to those contacts."); *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1359 (Fed. Cir. 1998) ("Jurisdiction in this situation has the name specific jurisdiction.  In fact, even a single act can support jurisdiction, so long as it

Redacted Material Subject to Protective Order

creates a substantial connection with the forum, as opposed to an attenuated affiliation.").

In any event, the Court need not rely on a "single act" or other "isolated or sporadic" contacts in this case. TUC engaged in a years-long marketing effort directed to Arizona OEMs such as Intel and Emerson to convince them to use the infringing TU-872 products. Appx12, Appx30261, Appx30374-375, Appx30377-30378, Appx30380-30381, Appx30383, Appx30399, Appx25779-25805, Appx25809, Appx42194-42195, Appx42197, Appx42205. The district court also noted that TUC employees had other Arizona contacts as part of its effort to market the TU-872 products. Appx12. Indeed, the district court's factual findings were not exhaustive with respect to TUC's efforts to travel to Arizona for the purpose of marketing the TU-872 products in Arizona to both OEMs and direct PCB customers. *See, e.g.*, Appx30380 ███████████████████████

███████████████████████████████████████████

███████████████████████████████████

Appx30383, Appx42250, Appx42252, Appx42254. TUC's extensive efforts directed toward Arizona are thus distinguishable from the limited activities described in the non-Federal Circuit cases cited by TUC. *See* TUC Br. at 34. And TUC's activities are also far greater than the forum activities in *Grober*, 686 F.3d at 1347, where the defendant's connections to the forum state were limited and

"Appellants could not show that [the defendant] targeted the California market at all." *Id.* In contrast, the district court's factual findings demonstrate that TUC deliberately targeted its marketing activities regarding the infringing TU-872 products toward Arizona.

TUC tries to minimize the importance of its OEM contacts by arguing that it only "occasionally" markets to OEMs, who purportedly are not even customers of TUC. TUC Br. at 37. But TUC's arguments are contrary to the evidence, which confirms that TUC views its OEMs as "customers," even though TUC does not sell directly to them. *See e.g.*, Appx30135 ("The key now is convincing the top customers – especially OEMs – to continue using our product during the legal process."); Appx40277 ("So far we've been able to convince all customers – big like Cisco, Brocade, HP, Dell, Oracle, Google and small – to continue."). Indeed, it is the OEMs—not the PCB fabricators to whom products are directly sold—that actually determine which manufacturer's materials will be used in their products. *See, e.g.*, Appx39583-39584, Appx40133-40135, Appx33359. For this reason, TUC has an "OEM marketing team" and its employees regularly travel to the U.S. to market to TUC's OEM customers. *See, e.g.*, Appx40004, Appx40011, Appx40023, Appx40082, Appx40094, Appx40096, Appx40275, Appx40242. TUC's suggestion that OEMs are not relevant to Isola's infringement claims

because the OEMs don't directly purchase product from TUC is contrary to the evidence.

TUC contends there is no jurisdiction unless Isola can prove that the infringing TU-872 products were used or sold in Arizona, but this contention is wrong for several reasons.  TUC Br. at 31-32, 35-37.  TUC's intentional inducement of others to infringe in Arizona is as much of an act of patent infringement as any sale or use of an infringing device would be.  35 U.S.C. § 271(b) ("[w]hoever actively induces infringement of a patent shall be liable as an infringer."); *see Energetiq*, 113 F. Supp. 3d at 467.  Here, the acts of inducement with respect to OEMs such as Emerson, Intel and IBM—all of whom conducted the necessary testing to become qualified to purchase and use the TU-872 products (Appx30442-30443, Appx42207)—occurred when TUC employees traveled to Arizona to convince the OEMs to use the TU-872 products.  TUC cites no authority for the proposition that Isola must demonstrate that both the inducing acts *and* the direct infringing acts took place in Arizona.

TUC's argument stands the law of personal jurisdiction on its head.  Under TUC's theory, jurisdiction would be proper if an OEM elected to use the TU-872 product in Arizona, but is not proper in this case because there is no "concrete" evidence of such third party use in Arizona.  Setting aside TUC's disputes with the district court's factual findings, TUC's argument fails because the focus of the

jurisdictional analysis is TUC's conduct. TUC's suggestion that jurisdiction in this case should rise and fall based on the downstream conduct of a third party over whom the defendant has no control is contrary to the principles underlying the due process inquiry. Indeed, TUC acknowledges that "relying on the possible actions of a third party violates the Supreme Court's 'consistent[] reject[ion]' of 'attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between [a] third part[y] and the forum State.'" TUC Br. at 33. But that is precisely what TUC asks the Court to do.

And even if TUC were correct that the TU-872 products must have been present in Arizona to establish jurisdiction, the district court's determined based on the evidence that it was "more likely than not" that "infringing products … have been present in Arizona." Appx13. TUC did not demonstrate that the court's factual finding is clearly erroneous. The court was well within its rights as the trier of fact on this issue to find that circumstantial evidence supported its findings regarding the use and presence of the TU-872 products.

Specifically, the district court relied on an e-mail string that started with an inquiry from ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████ Appx13, citing Appx37120-37122. █████████ ████████████████████████████████████████████████

Redacted Material Subject to Protective Order

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

*See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1562-63 (Fed. Cir. 1994) (contacts with the forum after the events giving rise to the litigation are relevant to determine the existence of specific jurisdiction; "it would be arbitrary to identify a single moment after which defendant's contacts with the forum necessarily become irrelevant"). The court's additional findings—including TUC's admission that its products bear no distinguishing characteristics—are also consistent with the court's conclusion that it is "more likely than not" that "infringing products … have been present in Arizona." Appx437, Appx13. Likewise, the volume of TUC's sales and the use of the TU-872 products by U.S.-based OEMs like Intel, Emerson, HP, Cisco, EMC and others, supports the district court's conclusions. Appx28123-28127, Appx28142-28143, Appx40243-40245; *see also* Appx30388, Appx30442-30443.

In addition, separate and apart from the court's specific factual findings regarding the ██████████ the evidence presented by Isola is also consistent with the district court's findings regarding use of the infringing TU-872 products. Specifically, Isola presented an extensive record of Emerson's (one of the Arizona OEMs to whom TUC marketed) use of the TU-872 products. For example, TUC's

Redacted Material Subject to Protective Order

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████    Appx30304.  TUC contends that these

documents, which describe Emerson's use of the TU-872 products, are merely

aspirational or prospective in nature, but that contention is contrary to the

evidence.  *See* Appx42207, Appx42210 ████████████████████████████

████████████████████████████████; Appx42216 █████████████

███████████████████████████; *see also* Appx42214,

Appx42238, Appx42245-42246, Appx42248, Appx37117-118, Appx30304.

TUC's characterization of its Emerson qualification efforts is also unpersuasive

based on the district court's observation that "TUC has strenuously resisted

providing information throughout the course of these proceedings as to the

applications for which its products had been qualified."  Appx49, n.3 ("It is unclear

whether TUC did not know this information or was refusing to provide it.").

Although TUC disagrees with the district court's findings regarding Emerson's use

of the product, the court's factual findings are consistent with the evidence and

TUC cannot demonstrate clear error.

Finally, TUC's argument that the specific contacts with Arizona identified

by the district court are insufficient to support minimum contacts ignores the

district court's findings regarding TUC's discovery misconduct, and the lack of candor demonstrated by TUC employees with respect to additional evidence regarding their activities in Arizona. TUC uses its own discovery misconduct as a sword by suggesting the e-mail record reflects the full extent of TUC's activities in Arizona, even though that suggestion is contrary to the court's factual findings, and is also contrary to the evidence presented at trial confirming that TUC's custom and practice is to regularly visit, and market directly to, its OEM customers. *See, e.g.*, Appx40004, Appx40011, Appx40023, Appx40082, Appx40094, Appx40096, Appx40275, Appx40242. The evidence presented to the district court, and the court's factual findings based on that evidence, confirm that TUC purposefully directed its activities toward Arizona, and that personal jurisdiction satisfies due process.

### B.   The Court Properly Construed "Resin Composition."

The sole dispute on "resin composition" is whether the term is limited to "uncured resin composition," and thus excludes reacted (or "cured") resin compositions that nonetheless include the claimed ingredients. The ordinary meaning of this claim term and the intrinsic record of the Isola Patents show that the term "resin composition" includes: (1) uncured resin compositions, known as "varnish" in the art; (2) partially-cured resin compositions found in prepregs; and (3) fully-cured resin compositions found in laminates. TUC seeks to improperly

inject the words "that has not been partially or fully cured" even though these words do not appear in the claims.

### 1. The Ordinary Meaning of "Resin Composition" Is Not Limited to "Uncured Resin Composition."

"There is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013). The "ordinary meaning" of a claim term is its meaning to a person of ordinary skill in the art after reading the patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (*en banc*). "The written description and other parts of the specification . . . may shed contextual light on the plain and ordinary meaning; however, they cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Aventis Pharm.*, 715 F.3d at 1373.

Here, the district court was correct that the plain and ordinary meaning of the term "resin composition" as used in the Isola Patents is not limited to "uncured resin compositions." Appx174-176; *see also* Appx41769-41773 (Isola expert testimony). Recognizing as much, TUC's own expert likewise confirmed that the Isola Patents disclose partially and fully cured resin compositions. Appx41985-41986. Prepregs and laminates include elements in addition to the resin composition, such as fiberglass (in which the resin composition is impregnated)

and a layer of copper or other metal (laminated on both sides of a layer of prepreg), but that does not mean they no longer include the resin composition.  TUC fails to cite anything in the claims or the specification indicating a resin composition is no longer a resin composition once the curing process begins.

The district court's construction is also consistent with this Court's precedent concerning the ordinary meaning of the term "composition" in chemistry.  Contrary to TUC's argument, this Court has recognized that "composition" should ordinarily be construed to include any combination of the claimed ingredients "from the moment created."  *See Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1558 (Fed. Cir. 1995) (construing claims drawn to a "lubricating oil composition" as covering a product, and not merely a recipe of individual ingredients, because such a construction "preserves their identity as product claims, and recognizes as a matter of chemistry that the composition exists from the moment created"); *PIN/NIP, Inc. v. Platte Chemical Co.*, 304 F.3d 1235, 1244 (Fed. Cir. 2002) (relying on *Exxon* and noting terms used in the patent like "combination," "mixture" and "conjunction" all supported construction of "composition" as a mixture in "which the components are present together at some point in time").  Likewise here, the ordinary meaning of "composition" weighs heavily against TUC's improper attempt to limit the claim to only the moment in which the ingredients are combined.

### 2.   The Intrinsic Evidence Reinforces the Ordinary Meaning of "Resin Compositions."

TUC does not identify any disavowal or other language in the specification limiting "resin composition" to "uncured resin composition," or otherwise excluding partially or fully cured resin compositions from the scope of "resin composition." To the contrary, the specification shows that "resin compositions" include both partially-cured and fully-cured resin compositions. For example, the Isola Patents describe the partially-cured resins used in prepregs, and state that "prepregs [are] made of [] resin composition." Appx212 at 2:11-19, Appx213 at 3:15-17. The Isola Patents also state that a resin may be fully cured, as in the case of laminates: "Laminates for use in the electronics industry (particularly for printed wiring boards) are generally produced by impregnating a supporting or reinforcing material (usually based on glass fibres [sic], either as a woven fabric or in the form of a cross-ply laminate of unidirectionally oriented parallel filaments) with a resin, followed by the resin being cured wholly or in part." Appx214 at 5:14-25. Far from limiting "resin composition" to "uncured resin compositions," the specification thus shows that "resin compositions" include cured resin compositions found in prepregs and laminates.

Indeed, the Isola Patent specifications repeatedly use the term "resin composition" to describe the partially-cured and fully-cured resin compositions in

prepregs and laminates, and the beneficial properties of those cured resin compositions resulting from the invention.  For example:

- "On the one hand, the invention has the object to ***enhance the thermal and electrical properties of resin compositions*** based on epoxy resin cross-linked with styrene maleic anhydride copolymer (SMA).  On the other hand, the invention envisages ***resin compositions*** based on difunctional epoxy resin ***which have thermal and electrical properties comparable to IPNs*** the resin composition of which is based on multifunctional epoxy compounds. Furthermore, the invention aims to provide ***resin compositions where the problem of brittleness***, which occurs when SMA is used as epoxy cross-linking agent, ***can be prevented***."  Appx212 at 2:41-51 (emphasis added).

- "Most preferably, the co-cross-linking agent is a mixture of tetrabromobisphenol A (TBBPA) and tetrabromobisphenol A diglycidyl ether, leading to ***resin compositions with high thermal stability and a high Tg***."  Appx213 at 3:12-15 (emphasis added).

- "It is known from WO 96/07683 that epoxy ***resin compositions*** which are free from allyl network forming compound, such as TAC, ***have low Tg, usually not higher than 130° C., and low thermal stability***."  Appx212-213 at 2:66-3:2 (emphasis added).

- "This patent also discloses a proposal to use copolymers of maleic anhydride and styrene (SMA) as cross-linking agent for epoxy resin. A drawback to such epoxy *resin compositions* is that they *have low Tg and low thermal stability*, rendering them unsuitable for use in prepregs, which are applied in laminates for printed wiring boards (PWBs)."  Appx212 at 1:11-17 (emphasis added).

These passages explicitly refer to the benefits of the invention for "resin compositions" with high thermal stability, high electrical stability, and less brittleness.  The specifications also describe the specific curing methods and conditions to produce those cured "resin compositions" (Appx214 at 6:32-46 ("Example 2")), and further describe methods to evaluate the improved thermal and electrical properties of the claimed resin compositions, such as:  (1) $T_g$; (2) the pressure cooker test; and (3) the solder shock test.  Appx214 at 5:32-6:2.  Each of these tests can be performed only on cured resin compositions.  Appx41772. Likewise, the "brittleness" of a "resin composition" can refer only to cured resin compositions, as the uncured varnish is a liquid and cannot be brittle at all. Appx39694.

The Isola Patents' specifications thus describe resin compositions that are uncured, partially cured, and fully cured.  Appx41772.  The whole point of the invention is to provide improved properties for the cured resin compositions in

prepregs and laminates.  And TUC has not identified any portion of the

specification that would operate as a definition or disavowal to limit the ordinary

meaning. [3]

### 3. The Claims of the Related '258 Patent Also Support the Plain and Ordinary Meaning of "Resin Composition."

"[D]ifferences among claims can also be a useful guide in understanding the

meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314.  Isola's related

'258 patent—the child to the '414 patent and parent to the '140 patent—includes

similar independent claims reciting "resin composition," and dependent claims 14

and 15, which recite "wherein the resin is partially cured" and "wherein the resin is

fully cured."  Appx228 at 8:29-32.  TUC's "uncured" resin composition

construction would make claims 14 and 15 internally inconsistent by excluding

their recited "partially cured" and "fully cured" limitations.  Thus, the claims of

this related patent further confirm that "resin composition" in each of the Isola

Patents includes both "partially cured" and "fully cured" resins.

### 4. TUC Tries To Inject A Non-Existent "Uncured" or "Varnish" Limitation.

The centerpiece of TUC's argument is its assertion that the claims of the

Isola Patents *must* be limited to "pre-reaction" ingredients or "starting materials"

---

[3] TUC's proposed construction also is inconsistent with the testimony of its own expert, who said he would distinguish one "cured epoxy network" from another "cured epoxy network" by "talking about the ***resin composition***" of those ***cured*** networks.  Appx5102 (emphasis added).

allegedly because each of the individual ingredients is consumed or altered during reaction such that they no longer exist in partially or fully cured resins.  TUC Br. at 44-45, 53.  But if TUC were correct that the curing reaction used to make prepregs and laminates so thoroughly "changes the products' make-up" (TUC Br. at 52) that they no longer include the ingredients recited in the claims, that is a noninfringement argument TUC could have pursued.  TUC did not raise any such defense on summary judgment or at trial.  Indeed, the only evidence presented regarding this issue at trial confirmed that each of the claimed ingredients are present in the infringing TU-872 prepregs and laminates.

Specifically, Isola's expert testified that he commissioned testing and analysis, such as NMR spectroscopy and FTIR spectroscopy, to confirm the presence of each of the claimed ingredients in TUC's cured prepregs and laminates.  Appx27057-27068, Appx27075-27076, Appx27478, Appx37210-37223, Appx42256-42269, Appx42271-42277.  TUC's expert never rebutted that testing and never conducted *any* of his own testing to support TUC's assertion that the curing reactions change or eliminate the claimed ingredients such that those ingredients are no longer present in the prepregs and laminates.  Appx40966, Appx41030-41031.  Having made the strategic decision not to present that noninfringement defense at trial, the Court should reject TUC's attempt to now

backdoor that argument through a claim construction that is contrary to the ordinary meaning of "resin composition."

TUC's reliance on this Court's decision in *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553 (Fed. Cir. 1995), is misplaced because *Exxon* supports Isola's position.  TUC Br. at 52.  In that case, the patent claims were directed to a "lubricating oil composition . . . comprising" certain ingredients. Defendant Lubrizol sought to impose a temporal limitation on the composition claims that would have excluded compositions before certain chemical reactions between the ingredients take place.  *Exxon,* 64 F.3d at 1558.  But the Court rejected that argument, noting that "as properly interpreted, Exxon's claims are to a composition that contains the specified ingredients *at any time from the moment at which the ingredients are mixed together*. . . . Exxon is entitled to a broader scope that is not time-limited, one that reads on *any product at any time that contains the claimed proportions of ingredients*." *Id.* (emphasis added).  Just like the "lubricating oil composition" in *Exxon*, the "resin composition" in this case should not be construed to incorporate a temporal limitation that would exclude cured resin compositions with the claimed ingredients.  Rather, it should include "any product at any time" that contains the claimed ingredients.  *Exxon*, 64 F.3d at 1558. TUC merely repackages a noninfringement defense it never asserted at trial as a claim construction issue, and this repackaging should be rejected.

TUC's also wrongly contends that restriction requirements during the prosecution history of the Isola Patents limit the scope of the claims to uncured resin compositions. TUC Br. at 50-53. Although restriction requirements may give rise to disclaimers that can limit the scope of patent claims, this Court has emphasized that such disclaimers must be "clear and unmistakable" disavowals regarding the claim scope. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013). In *Plantronics*, for example, the Court declined to limit the scope of the claims based on a restriction requirement, noting that "[w]e cannot discern from the correspondence between the PTO and Plantronics whether the 'stabilizer support member' and the 'concha stabilizer' were interpreted by any party to contain particular structural limitations." *Id.* at 1352.

Here, TUC never argues that the restriction requirement was the type of "clear and unmistakable" disavowal of claim scope made by the patentee that would limit the term "resin composition" to "uncured resin compositions." The words "uncured," "partially cured," or "fully cured" were never mentioned in the restriction requirement or the patentee's response to it. TUC also focuses entirely on the fact that the examiner issued a restriction requirement, but at least with respect to the '414 patent, ignores that the patentee "traversed" or disagreed with the restriction requirement. TUC Br. at 10, 50-52; Appx38352-38353, Appx38363. "[A]n applicant's silence regarding statements made by the examiner

- 42 -

during prosecution, without more, cannot amount to a 'clear and unmistakable disavowal' of claim scope." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005). If a patentee's silence cannot amount to a clear and unmistakable disavowal, disagreement cannot either.

In addition, the prosecution history supports Isola's position, not TUC's. TUC ignores the language of the draft claims at issue, but a closer examination of these claims confirms that the patentee regarded the claimed "resin compositions" as including both partially and fully cured resin compositions. The original claim being restricted out in the '414 patent was directed to the following laminate:

> A laminate comprising a synthetic layer and a metal layer, characterized in that the synthetic layer *is composed of the resin composition* of claim 1, which may optionally be reinforced with fibres.

Appx38325 (emphasis added).

Similarly, the draft claims submitted in connection with the '140 patent provided for:

> 19. (New) *A prepreg comprising*: a reinforcing fabric; and a *the resin composition of claim 1*, wherein the thermosetting resin is impregnated in the reinforcing fabric.
>
> 20. (New) *A laminate comprising at least one layer consisting of a cured prepreg of claim 19* and at least one metal layer.

Appx 38891 (emphasis added).

Thus, far from supporting a definition of "resin composition" that is limited to the uncured varnish, the draft claims subject to the restriction requirements confirm that cured prepregs and laminates contain the claimed "resin composition." The claims in the restriction requirements identified by TUC are thus consistent only with the conclusion that the claimed "resin composition" includes cured resin compositions in prepregs and laminates. [4]

TUC also misstates the legal grounds for the restrictions. Neither the examiner nor the patentee ever stated that restriction was required because of some distinction between cured and uncured resins. Instead, restriction was required for different procedural reasons. *See* Appx 38337, Appx38908. In the '140 patent prosecution history, the examiner noted the claims were "mutually exclusive" as defined by MPEP 806.05(j) because the "intermediate product is useful to make other than the final product, and the species are patentably distinct. . . . In the

---

[4] Contrary to TUC's position now, TUC's expert testified during claim construction that there is nothing in the Isola Patents' prosecution histories that limits "resin composition" to materials that are not partially or fully cured. Appx41988. TUC did not make this restriction requirement argument in the district court proceedings, and did not submit the portions of the file history it now until long after the *Markman* hearing and more than four months after the jury trial was already completed. Appx38207-38208. TUC did not even file a motion for leave to submit these materials or ask the district court to reconsider any ruling in light of those materials, but rather simply filed a notice so it could later assert these materials are part of the "record" on appeal. In any event, as shown in this argument section, TUC's belated theory lacks merit even if the materials are considered.

instant case, the intermediate product is deemed to be useful as a molding

formulation. . . . " Appx38908; *see also* Appx214 at 6:3-16 (noting the resin

compositions claimed in the patent can be used in several other applications,

including molding). In other words, the USPTO required restriction because the

intermediate product (the resin composition) can be used to make final products

other than prepregs and laminates (such as molding), not because of any distinction

between cured and uncured resin compositions.

Nor was the restriction requirement in the '414 patent based on any

distinction between cured and uncured resin compositions. Indeed, that restriction

was not even based on U.S. patent law. Instead, that restriction was required by

treaty under PCT Rule 13.1, as noted in the restriction requirement. *See* Appx

38337. Under that rule, the examiner first determines whether there is any "special

technical feature," which means something that makes the invention novel and

non-obvious. *See also* 37 C.F.R. § 1.475(a). Here, restriction was required under

PCT Rule 13.1 because the resin composition at issue was deemed obvious in view

of the prior art listed in the International Search Report, and thus had no "special

technical features" that could support the laminate claims. *See* Appx 38337. There

is nothing in the restriction requirement that makes any distinction whatsoever

between cured and uncured resin compositions. TUC's mischaracterizations of the

'414 and '140 patent prosecution histories fail to establish any clear and

unmistakable disavowal that would justify departing from the ordinary meaning of "resin composition."

TUC's proposed construction is also inconsistent with its own arguments. While TUC argues that "resin composition" should be limited to "pre-reaction" compositions (TUC Br. at 47), TUC's exclusion of "partially cured" compositions (such as prepregs) would exclude products containing the same unreacted composition that TUC argues the claims require. By definition, resin compositions that are only partially cured still include uncured resin composition. Both parties' experts acknowledged at trial that partially-cured prepregs include unreacted ingredients. Appx40923 (TUC expert testimony; prepreg is product of a "partial reaction" that "may contain some of the unreacted starting materials as well as some reacted ones"); Appx27504-27505 (Isola expert testimony; "a prepreg has some reacted parts and some unreacted parts"). TUC's attempt to absolve itself of liability through a proposed construction that would exclude products with the same uncured resin composition to which it argues the claims are limited should be rejected. Nor does TUC's "pre-reaction" argument leave any basis for overturning the jury's verdict of infringement regarding its TU-872 prepreg products.

TUC's remaining arguments likewise fail. TUC's citation to portions of the specification indicating that the term resin composition includes the uncured varnish (*see* TUC Br. at 48-49) misses the point. The district court did not rule that

the claims exclude uncured resin compositions, but rather, that the term includes uncured resin compositions, as well as the partially and fully cured resins described in the specification.  It is not surprising that the specification refers at times to uncured compositions, just as it refers to partially and fully cured compositions.  TUC's proposed construction would eliminate the embodiments described in the Isola Patents (such as Example 2) from the scope of the claims, and is inconsistent with the ordinary meaning of the term "resin composition" in the specifications.

Finally, TUC's criticism of the district court's construction of "resin composition" for incorporating the Supreme Court's definition of the term "composition" as used in the Patent Act is meritless.  TUC Br. at 53-55.  The claims at issue are composition of matter claims as defined in the statute, and the Supreme Court's definition including "all compositions of two or more substances and … all composite articles, whether they be the results of chemical union, or of mechanical mixture" is as applicable here as it is in any other composition of matter claims case.  Further, the court's construction is consistent with decisions such as *Exxon*, where the claimed composition was construed to include "any product at any time that contains the claimed proportions of ingredients."  *Exxon*, 64 F.3d at 1558.  Just as the cake in TUC's analogy (TUC Br. at 3) still includes each batter ingredient (such as sugar), prepregs and laminates still include the claimed ingredients.  TUC's attempt to limit the claims should be rejected.

- 47 -

### C.    The District Court Properly Construed "Allyl Network Forming Compound."

The district court correctly construed the claim term "allyl network forming compound" to mean "[a] compound that is capable of forming an interpenetrating polymeric network under the conditions in the resin formulation at issue." Appx29132.  Although TUC does not advocate for an alternative claim construction in its appeal brief, it appears that TUC's only dispute with the district court's construction is the reference to "forming an interpenetrating polymeric network."  The district court's construction is supported by the claim language ("network forming"), the specification, the prosecution history, and the stated purpose of the invention.

### 1.    The Isola Patents Describe the Importance of Avoiding Interpenetrating Polymeric Networks (IPNs).

One important goal of the inventions described in the Isola Patents is to create resin compositions having high $T_g$ and thermal stability, without incorporating compounds that form an interpenetrating polymeric network (or "IPN").  Appx212 at 2:36-40.  An IPN is a chemical network in which the allyl network is interwoven with, not bonded to, the epoxy-styrene maleic anhydride network.  Appx5156.  The specifications of the Isola Patents describe an "allyl polymerizing agent" used in the prior art that created "an interpenetrating polymeric network (IPN)."  Appx212. at 1:27-28; 1:53-65.  However, the stated

- 48 -

purpose of the Isola Patents is to achieve similar thermal stability benefits without the drawbacks that result when IPNs are formed.  Appx213 at 3:18-19.

Consistent with that stated purpose, the specifications state that the absence of compounds that form an IPN was a critical distinction between the inventions in the Isola Patents and the prior art.  For example, the specifications state:

> It has now been found that in contrast to the previous solutions for obtaining suitable polymers for use in prepregs, IPNs are not necessary, and that epoxy resins free from TAC can be prepared having high $T_g$ and/or improved thermal stability.

Appx212 at 2:36-40.

*****          *****          *****

> Furthermore, it was found that resins according the invention exhibit a much better resistance to short, intense temperature increases than do standard FR4 epoxy resin and IPNs according to EP 413,386 and have better prepreg stability.

Appx214 at 5:39-43.

*****          *****          *****

> The resins according to the invention are capable of standing the solder shock test for 10 minutes, which represents a substantial improvement over both the aforementioned known IPNs, which bear it for about 3 minutes, and FR4 epoxy resin (about 4 minutes).

Appx214 at 5:63-67.

Based on this important goal, the language in each of the claims of the '414 patent reflects the inventors' desire to avoid IPNs by specifying that the claimed resin composition is "free from an allyl network forming compound."  Appx215 at

7:36-8:51.  And to the extent it was not already clear from the specification that the "network" taught in the claims is an IPN that distinguished the '414 patent from the prior art, the prosecution history removes all doubt.  For example, the applicants relied on the absence of an IPN to distinguish key prior art:

> *A second and independent reason for the patentability of all pending claims over the prior art of record is because the Japanese '476 patent discloses resin systems that cure by means of an interpenetrating network (IPN)*.  At least one ingredient of the '476 patent that cures via an IPN is the acrylonitrile-butatine [sic] copolymer.  *In contrast, the claimed resin systems do not include allyl network forming compounds that cure to form an IPN*.  As a result, absent some suggestions in the Japanese patent that several of the ingredients listed can be used in resin systems *without allyl network forming compounds that form IPN's*, the combination of the Japanese patent with any of the other prior art of record is improper.

Appx42002 (emphasis added).

Likewise, the prosecution history states that the USPTO relied on this distinction in considering the patentability of claim 1 of the '414 patent over the prior art.  Specifically, the Examiner stated as follows:

> *Nowhere in the Japanese patent abstract is there any indication that an IPN is formed*. The acrylonitrile-butadiene copolymer is not a required component and is not even present in the example.  Even if employed, the unsaturation in the acrylonitrile and butadiene is consumed during the copolymerization and *would not provide any unsaturation to generate an IPN*.  Furthermore, the unsaturation in copolymer is not even allylic.

Appx42006 (emphasis added).

In addition to these statements, the applicants later submitted a Preliminary

Amendment and stated:

> By way of review, the Applicants have discovered a resin
> compound of matter that is **not** cured in a manner ***that results
> in an interpenetrating polymeric network (IPN)*** but that
> nonetheless has acceptable thermal stability and very high $T_g$'s.

Appx42015 (emphasis added).

Contrary to TUC's suggestion that there is just a single "passage" in the

prosecution history related to IPNs (*see* TUC Br. at 59), the inventors repeatedly

emphasized the importance of avoiding IPNs throughout the specification and the

prosecution of the application that led to the '414 patent, and the USPTO likewise

acknowledged the importance of avoiding IPNs in allowing the claims.  That stated

purpose of the inventions is reflected in the claim language: "free from an allyl

network forming compound."  The district court's construction reflects the critical

purpose and benefits of the inventions, is consistent with the claim language that

refers to the absence of a "network forming" compound, and construes the claim

language in view of the specifications and the prosecution histories.  The district

court's claim construction should be affirmed.

### 2. TUC's Criticism Of The District Court's Construction Lack Merit.

TUC's criticisms of the district court's construction lack merit for several

reasons.

First, TUC has failed to offer any argument in its appeal brief regarding what the construction of the term "allyl network forming compound" should have been. This is perhaps because TUC's own claim construction position regarding this term changed several times during the case. *See* Appx2771 (TUC's initial position regarding "three or more allylic groups"), Appx4793 (TUC's responsive *Markman* brief; changing construction to "[a] compound with ~~three~~ two or more allylic groups") (strike-through in original); Appx37255-37256 (*Markman* hearing; TUC's counsel switches back to its initial proposed construction of "three or more" allylic groups); Appx8704 (TUC's "critique" of the district court's claim construction order; changing back to a "two or more" allyl group construction). TUC's inability to present a single, principled position regarding the construction of this term only underscores that TUC's arguments were without merit. Having failed to offer any argument regarding its own proposed construction in its initial brief, TUC should not be permitted to do so for the first time on reply. Fed. R. App. P. 28(c); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002).

Second, both of TUC's proposed constructions before the district court were properly rejected because they omitted any construction of the claim term

Redacted Material Subject to Protective Order

"network forming," leaving only an allyl compound as its construction.[5]  But

patent "claims are interpreted with an eye toward giving effect to ***all*** terms in the

claim."  *In re Gabapentin Patent Litig.*, 503 F.3d 1254, 1263 (Fed. Cir. 2007)

(emphasis added) (citations omitted).  TUC's omission of the "network forming"

language in its construction is particularly inappropriate here because the inventors

repeatedly emphasized in the specification and the prosecution history the desire to

avoid IPNs in order to obtain one of the key benefits of the claimed inventions.

Appx42002, Appx213 at 3:18-19, Appx212 at 2:36-40, Appx214 at 5:39-43,

Appx214 at 5:63-67, Appx42006, Appx42015.

Third, TUC has failed to articulate why a reversal would be appropriate even

under an alternative construction.  For example, even under TUC's proposed "three

or more allyl groups" construction that TUC advocated at the *Markman* hearing,

there is no evidence that would support a finding that the TU-872 products do not

infringe the '414 patent.  To the contrary, the evidence presented at trial is that the

█████████████████████████████████████████████████████

█████████████████████████████████████████████

Appx37016.  Thus, ██████████████████████████████████

---

[5] It was never disputed by either party that the term "allyl network forming
compound" required an allylic compound.  Appx29372, Appx41040.  The only
dispute between the parties was whether the term "network forming" in "allyl
network forming compound" should be given any meaning.

Redacted Material Subject to Protective Order

███████████████████████████████████████████████████████

████████████████████████████████    TUC's failure to offer any basis for

reversing the judgment based on an alternative construction that TUC failed to

identify on appeal only confirms that the Court should affirm the judgment.

Finally, TUC criticizes the district court's decision to grant Isola's *Daubert*

motion based on TUC's expert's untenable interpretation of the Court's

construction of "allyl network forming compound."  Though it does not appear

TUC is appealing the district court's *Daubert* ruling, TUC suggests that the district

court "rewrote the limitation at Isola's urging."  TUC Br. at 58.  That suggestion

mischaracterizes the district court's decision, where it found that ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████    Appx22103-22104.  TUC's

contention that the jury should have heard a patent infringement defense relying on

███████████████████████████████████████████████████████

is contrary to the law and common sense.  There are no grounds for reversal.

**D.    The Law And Evidence Support The Jury's Verdict And The District Court's Rulings Regarding Validity.**

**1.    The District Court Correctly Found That TUC Had Failed to Prove Indefiniteness.**

The Court reviews *de novo* the legal aspects of patent validity related to definiteness. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 897 (Fed. Cir. 2013), *vacated on other grounds by Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014). But where, as here, the legal conclusion regarding indefiniteness rests on factual findings made by the judge as a trier of fact, the Court may not set aside those findings unless they are clearly erroneous. *Daiichi Sankyo Co. v. Matrix Labs., Ltd.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010).

A patent claim only fails to meet the definiteness requirement of 35 U.S.C. § 112 "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). "[I]f the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite." *Biosig Instruments, Inc. v. Nautilus, Inc.,* 783 F.3d 1374, 1381 (Fed. Cir. 2015). As with all invalidity issues, TUC bears the burden of proving indefiniteness by clear and convincing evidence. *Nautilus, Inc.*, 134 S. Ct. at 2130 n.10.

Unlike most cases involving indefiniteness, TUC does not argue that the claim term at issue "free from an allyl network forming compound" is indefinite such that the term is not capable of construction. TUC Br. at 62-63. Rather, TUC argues that the district court's construction itself renders the claim indefinite because determining "whether an IPN actually forms in the final product" may require testing to determine whether that limitation is present. TUC cannot prove indefiniteness by clear and convincing evidence for several reasons.

First, the fact that determining whether a particular claim limitation is present in an accused product (or the prior art, for that matter) may require some degree of analysis or testing makes this limitation no different from many others in patent claims. This Court has held that "the fact that some experimentation may be necessary to determine the scope of the claims does not render the claims indefinite." *Exxon Research and Eng'g Co. v. United States*, 265 F.3d 1371, 1379 (Fed. Cir. 2001). And TUC has not argued that any amount of testing or analysis is undue such that the claims are not enabled. The reason for that is clear—as the district court noted, there was "considerable evidence that the temperature and curing conditions under which an IPN would form were well understood by a person of ordinary skill in the field." Appx36-37. TUC's indefiniteness arguments are contrary to the law. *See Aventis Pharma SA v. Hospira, Inc.*, 743 F. Supp. 2d 305, 328-31 (D. Del. 2010) (apparatus claim may "state that the apparatus is

capable of performing particular functions") (citing *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008)).

Second, the district court's factual findings confirm that persons of ordinary skill in the art were well-aware of the compounds and conditions that produce an IPN, such that a person of ordinary skill in the art could readily determine what is being claimed in the '414 patent. For example, the district court found that persons of ordinary skill in the art would know the minimum amount of an allyl compound (such as TAC) required to form an IPN. Appx30616. The district court also found that persons of skill would understand that other components in the composition— such as a radical initiator—are necessary to form an IPN. Appx30618. Further, the district court found that the prior art discussed in the specification of the '414 patent—specifically, WO 96/07683 (a reference that TUC argued anticipated the claims at trial)—described the conditions under which an IPN will be formed. Appx30617-30618. The district court also found that "a person skilled in the art would know that if no allyl compound was added at all, an IPN could not and would not form. Also, a person skilled in the art in September 1997 would have known that even if the person sought to add an allyl compound, it would be possible to determine whether or not an IPN would form because that person could either analyze or test all of the necessary variables." Appx30618. Each of the district court's factual findings are well-supported by the evidence presented at

Redacted Material Subject to Protective Order

trial (Appx30588-30595), and underscore that TUC cannot satisfy its burden to

prove indefiniteness by clear and convincing evidence.

TUC cannot demonstrate that any of the district court's factual findings are

clearly erroneous, and instead disagrees with the district court or ignores its factual

findings.  For example, TUC disagrees with the district court's conclusion that a

person of ordinary skill would know the minimum amount of an allyl compound

(2%) required to form an IPN based on the explicit disclosure in the prior art, and

argues that ████████████████████████████████████████

████████████████████████████████████████ TUC Br.

at 62 (citing Appx28878-28879).  But the portion of the record TUC cites is TUC's

own expert's testimony regarding invalidity based on anticipation of the alleged

███████████  *Id.*  That testimony is directly contrary to the testimony of Isola's

expert, who opined that ████████████████████████████

████████████████████████████  Appx29373-

29374.  The jury agreed with Isola and found no invalidity.  The rejected opinion

testimony of TUC's own expert falls far short of the high bar TUC must satisfy to

demonstrate the district court's factual findings were clearly erroneous.

Finally, even apart from the district court's factual findings, the record at

trial shows that persons of ordinary skill in the art readily understood the scope of

the claims of the '414 patent.  No witness—not TUC's expert, nor Isola's expert—

was confused about the scope of the invention. If an IPN forms, then the claims are not infringed; and if an IPN does not form, then the claims are infringed. Appx37058. It was well-understood by persons of ordinary skill that only a limited number of compounds, most of which were known and described in the prior art, could be allyl network forming compounds (Appx37109), and those compounds could be easily avoided. Indeed, the '414 patent teaches to stay away from these compounds. Where no such compound is added, even TUC acknowledges there is no alleged ambiguity. Appx37056-37057.

TUC's alleged ambiguity only arises in a hypothetical scenario where TAC or a similar compound known to form an IPN is added to a resin composition (despite the '414 patent's strong admonishment against using such compounds) under conditions that would not form an IPN. But even in that limited hypothetical circumstance, the evidence presented at trial supports the conclusion that a person of ordinary skill would still understand the scope of the claims. The record shows that the temperature and curing conditions under which an IPN would or would not form were well-understood by those skilled in the art. Appx37110-37111. And even TUC's expert acknowledged that persons of ordinary skill would know that a cured resin composition could be tested to determine if an IPN were present. Appx37052-37053. At most, TUC's hypothetical describes its own alleged difficulty in avoiding infringement, rather than addressing the supposed

Redacted Material Subject to Protective Order

indefiniteness of the claim. "The test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed. Cir. 2005). TUC cannot satisfy its burden to demonstrate by clear and convincing evidence that the claims of the '414 patent are indefinite.

### 2. Substantial Evidence Supports the Jury's Verdict of No Invalidity Based On Nelco.

Whether a patent is invalid for a public use or sale is a question of law based on underlying facts, which are reviewed for substantial evidence following a jury verdict. *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Here, TUC argues for reversal of the jury's verdict that claim 9 of the '140 patent is not invalid in view of

████████████████████████████████████████ Like all other invalidity issues, TUC bears the burden of proving by clear and convincing evidence that the Nelco resin compositions are prior art. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 91 (2011). TUC cannot satisfy that burden here because its arguments are contrary to the facts and the law.

Redacted Material Subject to Protective Order

As an initial matter, TUC states—without any citation to the record—that

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ TUC Br. at 23 (emphasis added).

TUC mischaracterizes the record. ████████████████████████

███████████████████████████████████████████████████

██████████████████████████████ Appx36995. TUC did not even

argue at trial that ██████████████████████████████████

███████████████████████████████████████████████████

██████████.

TUC's "public use" arguments also fail. "The proper test for the public use

prong of the § 102(b) statutory bar is whether the purported use: (1) was accessible

to the public; or (2) was commercially exploited." *Invitrogen Corp.*, 424 F.3d at

1380. TUC's arguments that Nelco was prior art fail for several reasons.

First, TUC's public use arguments ignore long-standing precedent that third-

party trade secrets are treated differently from an inventor's own trade secrets

under § 102(b)'s "public use" bar. "[W]hen an asserted prior use is not that of the

applicant, §102(b) is not a bar when that prior use or knowledge is not available to

the public." *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371

(Fed. Cir. 1998). "'[S]ecret commercialization' by a third party is not public use,

even if it might have resulted in forfeiture were the third party the one filing the patent application." *Dey, L.P. v. Sunovion Pharms., Inc.*, 715 F.3d 1351, 1359 n.4 (Fed. Cir. 2013), *citing W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983).  The factual question of whether ███████████ ███████████████████████ was critical to resolving whether ███████████were a "public use" under § 102(b).

Here, the jury heard evidence that ███████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Appx37088-37089; *see also* Appx36861 ("Is it possible to reverse engineer a competitor's product …?  A.  No.  You can't do that.").  ███████████ ████████████████████████████████████████ █████████████████████████ Appx36991-36993.  Thus, the jury heard substantial evidence that the public was *not* in possession of the features of the claimed invention, and the district court correctly denied TUC's renewed invalidity JMOL.

Second, TUC's argument that ████████████████████ ████████████████████████████████████runs contrary to the facts and the law.  "[E]ven in the case of third party uses, being

Redacted Material Subject to Protective Order

'accessible to the public' still requires public availability; secret or confidential third-party uses do not invalidate later-filed patents." *Dey*, 715 F.3d at 1355, 1359 (claims directed to chemical formulation not in public use where study participants had "limited knowledge of [the] formulation"). Here, the evidence demonstrated

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████  Appx36991, Appx37088-37089, Appx37038. The jury thus properly "decide[d] whether the claimed features of the patents were placed in the public's possession" and "conclude[d] that if members of the public are not informed of, and cannot readily discern, the claimed features of the invention in the allegedly invalidating prior art, the public has not been put in possession of those features." *Dey*, 715 F.3d at 1359; *W.L. Gore & Assocs.*, 721 F.2d at 1549 (no public use because "[t]here is no evidence that a viewer of the machine could thereby learn anything of which process, among all possible processes, the machine is being used to practice").

Thus, there is substantial evidence supporting the jury's conclusion that a

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████

TUC's argument that ████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ (TUC Br. at 63-64),

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████ The jury's determination that █████████████████████

███████████████████████████████████████████████████████

██████ Nor was the district court using a different construction for "resin composition" when it observed that it is the particular ingredients that were claimed and which must be publicly accessible.  Appx19.

Third, there is also substantial evidence supporting the jury's verdict that TUC failed to satisfy the commercialization prong of public use under § 102(b).

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████ (Appx36995), █████████████████████████

█████████████████████████████████████████ Appx36993,

Appx37037, Appx37039.  ███████████████████████████████████

████████████████████████████████████ Appx36989-36990, Appx36996.

███████████████████████████████████████████████████████

████████████████████████████ Appx36997-Appx36998, Appx36851-36852,

Redacted Material Subject to Protective Order

Appx36876, Appx37089-37090, Appx37042-37044.  Thus, the jury heard

substantial evidence that ███████████████████████████████████████████

███████████████████████████████—almost one year after the September 24,

1996 critical date.

The fact that Nelco's ██████████████████████████████████████████████

further cuts against TUC's contention that they were commercially exploited.

"Commercial purpose underlies virtually every contact between inventor and

potential customer.  When testing an invention entails customer contact, that does

not convert an otherwise experimental purpose into a public use."  *Allied Colloids*

*Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1575 (Fed. Cir. 1995).

Finally, even if the Court were to find that TUC has met its high burden to

demonstrate the jury's verdict regarding validity of the '140 patent is not supported

by substantial evidence, TUC's arguments do not have any practical impact on

TUC's appeal.  TUC's arguments regarding the '140 patent do not reduce the

scope of the injunction or the infringement finding in this case because the scope

of products accused of infringing the '414 patent is exactly the same as the '140

patent.  Appx27082-27088.  Nor do TUC's arguments impact or reduce the scope

of damages because the infringing TU-872 products are all covered by both patents

and the damages period associated with the '414 patent is larger than the '140

patent.  Appx210, Appx217, Appx29174-29186.  In short, TUC's request for

reversal regarding the '140 patent has no impact on the scope of infringement, the

scope of the injunction, or the amount of damages awarded in this case.

### E.    The Court Properly Found The Case Exceptional And Awarded Attorney's Fees.

This Court reviews all aspects of a district court's exceptional case

determination under 35 U.S.C. § 285 for an abuse of discretion.  *Highmark Inc. v.*

*Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1749 (2014).  An "exceptional"

case is simply "one that stands out from others with respect to the substantive

strength of a party's litigating position (considering both the governing law and the

facts of the case) or the unreasonable manner in which the case was litigated."

*Octane Fitness LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).

"District courts may determine whether a case is 'exceptional' in the case-by-case

exercise of their discretion, considering the totality of the circumstances."  *Id.*

Here, the district court analyzed the totality of the circumstances as required

by *Octane Fitness*, and properly exercised its discretion to find the case

exceptional and award attorney's fees to Isola.  These circumstances included

"ample evidence in the record from which a reasonable jury could and, in fact, did

discern, by a preponderance of the evidence, that TUC proceeded with the sales of

its 872 products when it was aware of the Isola patents, knew that the use of TUC's

products in the United States would infringe those patents, and specifically

intended for that infringement to occur."  Appx55.

TUC's disagreements with the court's reasoning fail to show an abuse of discretion.  TUC's assertion that court found case exceptional "merely because a party was found liable for induced infringement" and that this was a "run-of-the-mill" inducement case is wrong on both counts.  TUC Br. at 70.  The district court did not find the case exceptional merely because TUC was found liable for inducement.  Rather, the court exercised its discretion to consider the totality of the circumstances, including TUC's knowledge of Isola's '414 patent, TUC's knowledge of its infringement of that patent, and TUC's efforts to conceal its infringement through a "marketing strategy" designed to "avoid being sued." Appx41, Appx55-58.  The district court noted that TUC's own internal documents demonstrated that TUC "elected to take a 'calculated risk' in selling its infringing products."  Appx56.  These facts render this case far more than a "run-of-the-mill" case of inducement, and affirming the district court's proper exercise of its discretion would not be tantamount to ruling that all inducement cases are exceptional *per se*.

Moreover, these were not the only factual findings supporting the fees award.  The district court also found that "the conduct of TUC's employees during the course of this litigation was exceptional insofar as there was a pronounced lack of candor while under oath.  Quite simply, significant portions of the testimony of several of TUC's employees could not rationally be believed as true."  Appx56.

The court then recited several examples where four different TUC witnesses lied under oath. This unusual litigation misconduct amply supports an exceptional case finding and fees award. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 859 (Fed. Cir. 2010). And the Supreme Court has made clear that the absence of independent sanctions cannot save TUC from the consequences of its actions. *See Octane Fitness*, 134 S. Ct. at 1757 ("[A] district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees.").

The district court therefore did not abuse its discretion in determining that this case is exceptional and by awarding attorney's fees to Isola. As discussed in Isola's cross-appeal below, the only aspect of these rulings that should be vacated is the 50% reduction in Isola's fees award.

## VIII. THE DISTRICT COURT'S JMOL ON WILLFULNESS, DENIAL OF ENHANCED DAMAGES, AND REDUCTION IN ATTORNEY'S FEES SHOULD ALL BE VACATED POST-*HALO*.

### A. The Supreme Court's *Halo* Decision Requires Vacating The District Court's JMOL Of No Willfulness.

The jury found clear and convincing evidence that TUC willfully infringed Isola's '414 patent. Appx29174-29186. Applying the then-controlling *Seagate* test to TUC's post-trial motion, the district court entered a judgment of no willfulness as a matter of law. Appx47-48. The district court's decision was based

entirely on *Seagate*'s objective prong.  *Id.*  For the same reason, the court declined to enhance damages under 35 U.S.C. § 284.  Appx48.  The court also cut Isola's fees award in half based at least partly on the JMOL of no willfulness.  Appx60-62.

After TUC and Isola filed their notices of appeal, the Supreme Court decided *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016) ("*Halo*"). In *Halo*, the Court rejected the clear-and-convincing standard of proof of willfulness in favor of the lower preponderance-of-the-evidence standard.  *Id.* at 1934.  The Court also rejected *Seagate*'s requirement of "a finding of objective recklessness in every case before district courts may award enhanced damages." *Id.* at 1932.  Such a threshold requirement, the Court explained, "excludes from discretionary punishment many of the most culpable offenders, such as the 'wanton and malicious pirate' who intentionally infringes another's patent—with no doubts about its validity or any notion of a defense—for no purpose other than to steal the patentee's business."  *Id.*

The district court's grant of JMOL was based entirely on its conclusion that TUC's claim construction arguments on "resin composition" were incorrect but not objectively unreasonable under *Seagate*.  Appx47-48.  But then "the Supreme Court's decision in *Halo* expressly rejected the notion that objective recklessness must be found in every case involving enhanced damages for willful infringement."  *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340 (Fed. Cir. 2016).

Accordingly, the sole basis for the district court's decision to overturn the jury's willfulness verdict is no longer a defense to willfulness. Consistent with this Court's post-*Halo* decisions, the district court's grant of JMOL therefore should be vacated. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, __F.3d__, 2016 WL 5864573, at *17 (Fed. Cir. Oct. 7, 2016) (*en banc*) (vacating district court's JMOL of no willfulness based on objective prong); *WesternGeco L.L.C. v. ION Geophysical Corp.*, __F.3d__, 2016 WL 5112047, at *4-5 (Fed. Cir. Sept. 21, 2016) (same); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1381 (Fed. Cir. 2016) (same).

Because the district court did not rule on TUC's post-trial challenge to the jury's finding of subjective willfulness, the presumptively appropriate path is to remand the JMOL issue to the district court for consideration in light of *Halo*. *See WesternGeco*, 2016 WL 5112047, at *4 (remanding for district court to decide JMOL motion on subjective willfulness under *Halo*); *Apple*, 2016 WL 5864573, at *17 (remanding for district court to revisit JMOL motion under *Halo*). However, if TUC informs this Court that it will no longer pursue JMOL on subjective willfulness—an appropriate concession especially because the overwhelming evidence against TUC will now be viewed under the preponderance of the evidence standard—then the jury's willfulness verdict should be reinstated outright. *See Halo*, 831 F.3d at 1381 (reinstating jury's willfulness verdict because

"[o]n appeal, Pulse does not challenge the propriety of the jury finding of subjective willfulness"); *Stryker Corp. v. Zimmer, Inc.*, No. 2013-1668, __ F.3d __, 2016 WL 4729504, at *8 (Fed. Cir. Sept. 12, 2016) (reinstating jury's willfulness verdict because "[o]n [the first] appeal, Zimmer did not appeal the jury's finding of subjective willfulness under the *Seagate* test"); *Innovention Toys, LLC v. MGA Entm't, Inc.,* No. 2014-1731, 2016 WL 4151240, at *1 (Fed. Cir. Aug. 5, 2016) (unpublished) (similar).

### B.    The Court's Denial Of Enhanced Damages And Reduction In Isola's Attorney's Fee Award Should Be Remanded For Further Consideration In Light Of *Halo*.

For the same reason, the Court should also vacate the denial of Isola's motion for enhanced damages, and remand the issue to the district court for further consideration.  The district court's denial of Isola's motion for enhanced damages was based entirely on its grant of JMOL regarding willful infringement under *Seagate*'s objective prong and thus cannot stand.  *See, e.g., Stryker* 2016 WL 4729504, at *8  (remanding decision on enhanced damages post-*Halo*); *Innovention Toys*, 2016 WL 4151240, at *2 (same).

Likewise, the Court should vacate the district court's decision to reduce Isola's attorney's fees award by 50%.  The district court reduced Isola's fee award based at least partly on its grant of JMOL regarding willful infringement under *Seagate*'s objective prong.  Appx59 ("And the Court has also considered that due

to the Court's finding that Isola did not demonstrate that TUC's claim construction position was objectively unreasonable, the jury verdict of willfulness will not stand. . . . [M]ost cases that award full fees are based on a finding of willfulness, which is not the case here").  Because the basis of the JMOL of no willfulness has evaporated post-*Halo*, the Court should remand the amount of attorney's fees for further consideration.  *See Innovention Toys*, 2016 WL 4151240, at *2 ("The district court should also reconsider its fees award, which it viewed as related to its enhancement determination.").

## IX.    CONCLUSION.

The law and the evidence support the jury's verdict.  The judgment of infringement and no invalidity, plus the injunction based on that judgment, thus should be affirmed.  The district court's exceptional case finding and decision to award attorney's fees likewise should be affirmed.  Under *Halo*, this Court also should vacate the JMOL of no willfulness, and instruct the district court to consider enhanced damages and reconsider its reduction of the fees award on remand.


Dated:  October 21, 2016                    By: */s/ Richard T. Mulloy*
                                                Richard T. Mulloy
                                                DLA PIPER LLP (US)
                                                401 B Street, Suite 1700
                                                San Diego, CA  92101-4297
                                                619.699.2700

                                                Attorneys for Plaintiff/Cross-
                                                Appellant Isola USA Corporation

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2016, I electronically filed the foregoing

NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF FOR

CROSS-APPELLANT ISOLA USA CORPORATION with the Court's CM/ECF

filing system, which constitutes service, pursuant to Fed. R. App. P. 25(c), Fed.

Cir. R. 25(a), and the Court's Administrative Order Regarding Electronic Case

Filing 6(A) (May 17, 2012).  Per the parties' agreement, the Brief is also being

served on counsel by e-mail.


*/s/ Richard T. Mulloy*
Richard T. Mulloy
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B).  The brief contains 16,148 words, as calculated by the word count of

the word processing system used in preparing it, excluding the parts of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and

the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been

prepared in Microsoft Word 2010 in Times New Roman 14 point font.


*/s/ Richard T. Mulloy*
Richard T. Mulloy
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700